24-2509, 2523, 2513, and 2514. United States of America v. Goldstein, Turley, Twomey, and Eiler. Good morning and may it please the court. Amy Zaharia of Williams and Connolly for Appellant Ryan Toomey. I will cover the issues in Mr. Toomey's brief on behalf of all four of the grant judgment of acquittal or vacate and remand for a new trial. First, acquittal is required because the government prosecuted a conflict of interest as bribery without evidence beyond a reasonable doubt of a quid pro quo. The fatal problem with the substantive counts is that the SOMA defendants offered the alleged quid, the Remsco separation terms, at a time when the alleged quo, the lifting of the second chicken tender hole, did not even exist. Nothing the government points to overcomes that fatal problem and without the substantive counts, the statute of limitations forecloses conviction on the conspiracy. Well, hang on, you say, so we're focused on the November incident, right? Yes, your honor. And you say they offered it. Correct. But they didn't deliver it. They offered. If I offer you a bribe, you're a government official, and I say I'll give you 50 bucks to erase my parking ticket, okay, that I don't have yet. And then I get the parking ticket. But I still haven't given you the 50 bucks. And you don't cancel my parking ticket until I give you the 50 bucks. You're saying there's no bribe? Oh, that would be a bribe, your honor. But here there could be no bribe when they made the offer. Sure. No, I agree. There was no bribe when they made the offer. There was no quo. Right. But why do we have to measure it from that moment when they offered it? Because the government would have to point to something that changed the motivation for offering. Why can't they have the same motivation? They have to have a different motivation. Take my parking ticket. I give you 50 bucks. I say I'm going to give you 50 bucks if I ever get a parking ticket. And you would say, well, look, that's not definite enough. There's no quid pro quo because there's no parking ticket yet. Then there arises a parking ticket. And again, just posit that you have the capability of cancelling the parking ticket. And then you don't cancel the parking ticket until I fork over the 50 bucks. You're telling me that's not a bribe situation? The handing over the 50 bucks and the cancelling of the private ticket? That could be a bribe. Well, I'm not asking if it could be. Of course anything could be. But is it yes or no is the interesting part. I think that is a bribe. But there is no evidence here that at the time the SOMA defendants offered the separation terms, that it was an exchange for anything. Well, right, my point is who cares? Who cares about the time of the offer? Why is it not relevant or sufficient to support a conviction that at the time of delivery there was the connection? So in other words, when the quid was given, there was a quo. And it was pro. There is no evidence of that. All right, so there's a little difference, right? So the question is twofold. One is, is the scenario I've unfolded for you a bribe, a quid pro quo, where at the time of the giving there was a quid, there was a quo, and there was a link? So that's conceptually the question. It seems to me that answer has to be yes. And then the question is, is there proof that that happened? And I get that's a different thing. There is not proof that that happened. Okay, so tell me why there's not proof that that happened. Because I know you keep going back to the offer, but if we posit that the giving, at the time the giving is relevant, tell me why at the time of the giving, the delivery of the signing of the contract and the forking over the money, there wasn't a quid and a quo. So first of all, I'd say the court can ignore the fact. It is highly probative that at the time the SOMA defendants first offered the quid, there was no quo on the table. Their initial motive to offer that quid could not be bribery because there was no quo. But again, you're kind of fighting the hypothetical here. Posit that it may be probative of their intent, but that's a jury question of what was on their mind. Did they have some evil thought or not? But go to the time of the giving. Sure. There is no evidence that connects the two things, the alleged quid and the alleged quo. The government cannot point to any linking of the two other than mere speculation. It points to... What about the timing? And I know you say, well, it's mere timing, but what about the evidence? They argue that Goldstein, it wasn't just mere timing, like, oh, one thing happened and another thing happened at the same time, but Goldstein made the timing happen. He delayed, purposely delayed, or at least there is evidence that would have allowed the jury to conclude that he delayed canceling the parking ticket, so to speak, until he had that contract in hand. Tell me about that because that's not mere timing, right? That's the defendant making the timing happen. Sure. So I understand what the government is saying. They claim that Mr. Goldstein... So tell me why there's no evidence of him making the timing. The jury could not have concluded that he made the timing happen. He made the connection. There was no evidence as to why it took two weeks to make that decision. There was no evidence as to whether it was because he was... Well, that's interesting, right? So if the jury is left saying, well, he didn't say out loud why he delayed, but the one thing they know is that in the background are these negotiations for the contract. So the only rational evidence or inference, I guess the government would make, the only reason, the only possible rational explanation for this is he's waiting for the contract to be inked. That is not the only possible rational explanation. So tell me, give me another one then that's supported by something in the record. Sure. Well, the only evidence in the government's case as to the reason for the delay was the cross-examination of his subordinate, Mr. O'Brien, who explained that there was intense media scrutiny at that time, and it would have been prudent to wait two weeks in order to let the media scrutiny die down. That is actual evidence. So you're saying two competing inferences, and yours, the one improvering, is the only logical one, or the one with strongest... No, improvering is the only one that is sufficiently supported. What this court has said is that when the inference to be drawn is an element of the offense, as this one is, it needs to be not merely permissible, it needs to be sufficiently supported such that the jury could find that inference beyond a reasonable doubt. And there is just no evidence here from which a jury could conclude beyond a reasonable doubt that Mr. Goldstein intentionally delayed to extort from the Soma defendants terms they had already agreed to offer him. The theory doesn't even make sense. Why was he extorting them if they had already offered him the very terms that they ultimately agreed to? People agree to things all the time and then don't deliver, right? There was no evidence they were not delivering. The premise is not an illogical premise. You and I agree to do something and I'm pussyfooting around and you say, my gosh, we agreed on this, he's not delivering. I got to put his feet to the fire and make this happen. People have tentative agreements all the time and they fall through. There's nothing illogical about that. There's got to be some evidence that that was what was happening, right? And I urge the court to read the communications between September and November. They're cited at page 39 of our opening brief. There's nothing about those communications that suggest frantic urgency. It just shows a normal back and forth between parties tying loose ends to a contract, consulting with their lawyers, doing the kinds of things that you expect parties to an agreement like this to do. They do not support the government's extortion theory. Now, I see I'm way over time. If you've got more to say, this is, you know, we only have a couple of cases. Well, I would really like to make sure that I have time to discuss the food safety evidence, but if the court has more questions about Rule 29, I want to make sure I've answered them. Okay. So let me turn to the food safety evidence, if I may. And I'll try to be- Say the words again. You're speaking for me a little- Too fast. No, just those two words. Say it again. Just say it again. Just if the court has more questions on the acquittal argument.  I think the words food safety, right? You're going to turn to food safety? Yes, I am. Yes. Say food safety. Slowly. Sorry, Your Honor. I'm cognizant of the time and going too fast. Let me start on the food safety with two undisputed facts that come from the government's own case. First, the school food staff lifted the first chicken tenderhold after the choking incident without any involvement by Mr. Goldstein. That is undisputed at J8-1321. Second, school food staff recommended that Mr. Goldstein lift the second chicken tenderhold. And the government's bribery theory, again, as we've been discussing, is not that he should not have lifted it, but that, in fact, he waited too long to return these products to the menu. So given those undisputed facts, given that school food itself wanted these chicken tenders to go back on the menu, what business did the government have focusing its case and eliciting evidence about school children potentially dying and a staff member choking and meeting the Heimlich maneuver? So if I understand, the position that was taken in the district court in here is that your side agrees some evidence on this point would have been warranted, but you think that the amount and quality that was introduced was excessive to the point of being inflammatory? Correct, Your Honor. And in particular, our argument below and here is focused on four specific categories of evidence. It is the evidence of the choking, which the government returned to at least 10 times throughout the trial. It is the evidence and, in particular, testimony from Ms. Asher about her fears that school children were going to die, which the government returned to repeatedly throughout the case. It is the evidence of events that related, completely unrelated events that related to food safety in 2017 after the charge conspiracies ended. And it is the photographs of not only bones in chicken tenders, but bloody drumsticks, which have nothing to do with the relevant allegations, the food safety allegations in this case. So it is that those four categories of evidence on their own do not add any probative value to the fact of the holds that occurred in this case, which we don't dispute had to come into evidence. And they were extremely inflammatory. And to be fair to the district court, the government, I think, sold the district court a false bill of goods before trial when it told the district court that someone needed Mr. Goldstein's help given how bad things were. And then it sold that same bill of goods to the jury when it stood up an oral argument. And the district court even commented on that disconnect at Rule 29, when the district court acknowledged it had been under this misimpression that Mr. Goldstein was doing things that school food didn't want to be done related to these products. Although, in the end, the district court, upon mature reflection, when it issued its ruling, said it was fine, right? It did, Your Honor. And the district judge, very experienced district judge, sat through the entire trial and had a much closer palpable feel of how things play out before the jury than we will be able to recreate. That's why there's such a, you would agree, a deferential standard of review. It is deferential. And we accept that burden. But the judge, neither before trial, nor at the time of remnant trial, mistrial at motion, nor in his post-trial ruling, ever grappled with these specific categories of evidence and why these categories of evidence lent additional probative value. He just discussed the safety of evidence. You don't think the judge was unaware of this? I mean, these were all argued to the judge, right? They were. They were. I mean, sometimes your rulings are not going to reflect every single word of every sentence of every argument a party makes. But we would hardly presume that the court hadn't considered them, right? Well, sure. But again, I think if you look at the judge's rulings, he just talks about food safety evidence in general and the need to show... Yeah, but he knew what it was. I mean, we're not suggesting that he didn't know what food evidence we're talking about, right? He knew. I mean, he sat through the trial. Of course, yes. He knew it was the photos. He knew it was ashes. Of course, Your Honor. He knew these things. So I think if he uses that as shorthand, we know exactly what he's talking about. But he did not analyze why this evidence had probative value above and beyond the fact of the holds. That analysis just does not exist anywhere in any of those rulings. And we submit, for the reasons in our brief, it just can't possibly be harmless, given the closeness of this case and the way the government intentionally used this evidence in an inflammatory way. Were there any other topics you wanted to cover, just before you sit down? No, Your Honor. Would you remind me whether you participated in the trial? Did I participate in the trial? Yes, Your Honor. Thank you. Thank you. Yes, I was there every day of the trial. I argue the Rule 29 motion and many other motions. No, no, I do. Thank you. Thank you. OK, thank you very much. OK, now we're going to have counsel. Let's see, Attorney Baumgartel is next. We don't start the clock until you're all comfortable. I didn't realize Mr. Harriot was that much taller than me. Yeah, but if you wouldn't mind, tilt the microphones up as much as you can. Because I think that's, yeah. May it please the Court, Sarah Baumgartel of the Federal Defenders, on behalf of Eric Goldstein. A conflict of interest is not a federal crime, and failing to disclose a conflict of interest does not show criminal intent. Here, the defendants were charged with specific bribery offenses that required this specific intent to engage in the quid pro quo. But the government was able to obscure these legal requirements and to transform this trial into a referendum on Mr. Goldstein's ethics because of the district court's improper admission of extensive conflict of interest evidence. This confused the legal requirements, and this prejudicial error warrants a new trial. Is your argument, I mean, I assume, and I believe in your briefs, you acknowledge that the conflict of interest evidence is relevant to some extent, that you're not saying that it should, or maybe you're not saying that it shouldn't have come in at all, are you? I'm going to say it shouldn't have come in at all. We objected to this evidence below for a variety of reasons. Ultimately, I think that you can parse the government's arguments and get to something that has some minimal probative value. So the government offers on appeal and below three, essentially, reasons why it would be relevant and admissible. I think two of those are right out. One is the safe harbor provision, which they did not preserve below and which was not charged to the jury. One is this idea that the failure to disclose a conflict of interest shows the deceit necessary to prove honest services wire fraud. But that's foreclosed by skilling. And so the third is this idea that essentially concealment of the conflict of interest shows some consciousness of guilt. And so there's some minimal probative value in that regard. And so I would concede that there is case law saying that essentially concealing a rule violation is minimally probative of consciousness of guilt. But this was admitted as 404B evidence. And so you need to have the probative value substantially outweigh the risk of prejudice from the evidence. And in the context of honest services wire fraud, where there is this continuing confusion, even among courts, about what that requires and how that interacts with conflict of evidence rules, it should not have been admitted here. And if it was going to be admitted, then it should have been significantly less than the district court actually admitted. So one of the things that we objected to was the plain language conflict rules that the government entered through one of their witnesses and that they used extensively in their closing argument. And the government essentially used these rules to argue that Mr. Goldstein and his co-defendants. And so even though the limiting instruction that was given in this case, which we claim was ineffective, said that it shouldn't be considered as to the co-defendants, the fact is that the government used the evidence as to all the defendants. And they essentially argued that they all knew what they were doing was wrong, because here is the list of rules that they have violated by having this conflict of interest. And that it's just very difficult for a lay jury to understand the subtle distinction between the specific intent to engage in a quid pro quo versus the intent to do something wrong or corrupt or to violate the rules. And that's... I'm sorry, could you just remind me, in connection with this, are you... Did you challenge the district court's jury instructions as being confusing on this point or no? This is not a jury instruction... I have not raised a jury instruction issue. On this point, yeah. Correct, yes. No, I'm sorry to interrupt. No, it's fine. I only went into it because obviously one of the factors the courts considers in the 404B is whether there was a limiting instruction and whether that would be effective to remedy the prejudice. And in this case, part of the reason why it's not is because the district court here... I'm sorry, was there a limiting instruction? There was a limiting instruction. And so what it said is that the evidence could be used as to Mr. Goldstein's state of mind. The problem is that's a fairly vague and general instruction that doesn't effectively foreclose the improper use of the evidence. And so another component here, and I see my time is short, is that the government sought to craft this narrative that was essentially, here is a corrupt public official endangering the lives of school children, as we talked about with the food safety evidence. And the power of that narrative, I think, overwhelmed the jury's ability to consider the technical, legal requirements of the quid pro quo and specific intent to engage in bribery. And for those reasons, this evidence was highly prejudicial. I see my time... Just to be fair, I gather you participated in the trial. I did not, Your Honor. Yes, so hopefully I've caught myself up on the 6,000 pages, but... Got it. Thank you. Okay. Thank you very much. Now we will turn to Attorney Goldman for Mr. Turley. Is that right? It is, Your Honor. The police court, there is no dispute here that the trial court made a mistake. It confused Mr. Turley with one of his co-defendants, Blaine Eiler. And on that basis, it precluded Mr. Turley from conducting a bias cross-examination of the one witness... The trial court was one of our colleagues, Judge Chin. I understand, Your Honor. No, I'm just asking. Sorry? I'm just asking. Yes, yes. The trial... It was Judge Chin sitting by designation. He did come in late to the case. It was originally Judge Kogan in the Eastern District of New York, and he had a conflict. So Judge Chin came in and took the case over. And I think that that played a role in his confusion. Well, can I just ask, and I understand that he even said for a moment he was confused about Eiler, but then he came back to it afterwards. And I know after the witness left the stand and he allowed counsel to make a proffer of what you would have elicited with respect to the questions that he curtailed, and he determined at the end that there was no reason to call him back. Aside from that issue, there was no other curtailment of other questions going to bias, right? I looked at the transcript. He didn't say, you know, objections sustained, counsel sit down, right? I mean, he was perfectly happy to let you cross-examine on other issues. If you had other bases for suggesting that the witness was biased, right? I mean, he didn't cut counsel off. The only bias cross-examination that we had related to what Agent Fomey did when he arrested Mr. Cook. Oh, okay, good. So I just want to be careful that it's not that he precluded any bias examination. He precluded an inquiry and bias as to this particular thing. Right? He precluded the only bias cross-examination that we had. But why don't you go into some of the questions you would have asked? Because I think the devil's in the details here, right? I mean, some of the things you said is like, you would have crossed that he traveled from New York to Missouri as though that shows bias, which is sort of, frankly, a bizarre proposition to me. That's what FBI agents do, is agents from the charging district go and participate in the arrest or, you know, the agents were heavily armed. I've never heard of FBI agents going to a house to arrest someone and leaving their guns behind. You know, those are sort of nonsensical lines of argument. So what exactly is it that you think you were precluded from asking that would have been a permissible thing that would have actually shown bias? Your Honor, I think that the court has to look at this in the context of the direct examination and how Agent Duomi was portrayed by the government. Because they took pains to separate him from the prosecution team. Right? You got two case agents sitting at the table with the prosecutors. And they ask Agent Duomi, tell us what a case agent is. Okay. Are you the case agent here? No. Were you ever the case agent here? No. He's a lawyer. He was in the Air Force. He's just Joe Friday. He's just there to just tell the facts. And if we had been permitted to elicit on cross-examination, Agent Duomi's behavior. And, Your Honor, of course, Agent... It's the pulling down the mask and saying, do you remember me now? It is the pulling down the mask while Michael Turley is face down, handcuffed on a squad car. You remember me? You remember me now? And pulling down the mask. That is the taunting. And, you know, the trial court said, you know, so what? He felt strongly about it. He was an FBI agent and he was making arrest of someone he thought was guilty for crime. Your Honor, that does not happen typically. You're right. Agents go and they travel and they participate in arrests. Agents have guns. Maybe they even have battering rams. But that kind of post-arrest taunting of someone whose house you sat in six months ago who answered every question you asked, that, Your Honor, I think is probative of bias and it undermined the way the government was setting Agent Duomi up. So can I just understand sort of the buckets of questions that would have been asked? I understand the pulling the mask down and what you described as taunting. That's sort of one set. And then there were other things in your brief about the traveling a thousand miles and all that. What other, what other things besides the, let's call it the taunting incident as you describe it, what else is there that you would have asked that the district judge precluded you from asking? I think the taunting is in the context in which it happened where, you know, Mr. Turley was handcuffed, face down on a squad car. And that's the moment that Agent Duomi chose to come up and taunt him about it. All right. So that's the context. That's taunting, let's say, writ large. Okay. So you wanted some context for the taunting. Is there anything else you would have asked besides that? Yeah, unbiased. That you were prevented from asking. Not unbiased, Your Honor. Okay, good. Just so we understand the scope of the question before it.  And I think it's important that this court understand why it mattered. Because this allowed the government to portray Agent Duomi as a, you know, neutral witness and to conflate what Mr. Turley was actually asked with what the agent testified he was asking. You could see the evolution of that from... Can I just jump in for a second? The idea that he's being presented as a neutral witness. I mean, he is an agent. He's an officer. He's a witness for the government. I'm just not sure I'm convinced that that kind of bias or taunting, as you were calling it. I mean, certainly I would hope that it's not common, but I'm not necessarily of the mind that it doesn't happen. And so I don't know that the jury hearing that additional evidence like, oh, this officer, we thought he was completely neutral and had no stake in this case at all. It turns out, oh, he actually does want this individual to be charged. I just... The prejudice from that, I guess, is what I'm struggling with. Okay. Well, that goes to the harmlessness standard, Your Honor. And, you know, the government in its brief cites the wrong standard for harmlessness. It cites the standard for non-constitutional error. We can have fair assurance that this error didn't affect the verdict. That is not the standard that the district court or this court should have used. The standard is from Van Arsdale. And it is that the... So this is what the Supreme Court said in Van Arsdale. The correct inquiry is whether, quote, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. That's Van Arsdale. You know, government cites Van Arsdale over and over again. It does not use that language, which... Well, but the inquiry still is baked into the first part of the Van Arsdale argument. Of course, you're in Chapman v. California if you get a constitutional violation. But baked into the question of whether there's a constitutional violation to begin with is whether there was, in fact, any meaningful impact on the cross. Right? The first part of what you just quoted as the standard was assuming the full potential was realized. We have to conclude that the full potential would have been pretty meaningful. Right? If the full potential was nil, then you wouldn't then have to get into an outcome determinative question. Right? So we're still trying to figure out what's the delta that you would have gotten if you had fully realized the potential of the cross. OK. There's two questions, Your Honor. Right? There's whether or not this was a constitutional error in the first place, and then there's whether or not it was harmless.  And the government uses... But it's sort of baked into the first question of whether there's a constitutional violation. Right? Because if you want to ask about bias, it's not that any question that could have been probative of bias, if it's improperly excluded, now we have a constitutional violation. Right? If the delta from that one question as to bias is, yeah, you know, it would have been admissible, but by a whisker, it would have given you a hair's breadth of bias. We wouldn't say it rises to the level of constitutional violation. And I know it's sort of a weird standard where sort of the prejudice or the bias or the impact of the statement is baked into both the original question, is there a violation, and then later on in determining whether there's prejudice or harmlessness. But that's true of many standards. I mean, we had a case yesterday, the compulsory process, you know, we asked, would this have been meaningful and relevant and exculpatory to the defendant? If not, you don't have a violation to begin with, and you don't get into a separate harmlessness analysis. So talk about the delta.  Your Honor, I think that you're right. The difference between... Thank you. It's a math word. I got it now, thank you. Sorry. It's like counting against their time. No, no, no. Keep going. Go ahead. I think that we should look to this court's opinions in Brinson and Figueroa to talk about that kind of tension between the harmlessness standard and the constitutional error standard, right? So what the government says is, well, Brinson and Figueroa, they were all about racial animus, and Banarsdale, that was all about, you know, maybe getting some kind of preference from the government. And this court in Brinson actually rejected that distinction, said, we do not agree that the principle of these cases is so narrow. We view these cases as specific examples of the relatively immutable principle that under the Confrontation Clause, the accused must be given a full and fair opportunity to cross-examine adverse witnesses for bias. So those are not exhaustive categories. Those are just examples of this immutable, and what Banarsdale, I mean, if you read Justice Rehnquist's opinion of Banarsdale, it is a little bit weird, right? Because he says Confrontation Clause, unlike other constitutional issues, is based only on this witness, right? Not on the impact on the trial at large. But then he goes on to say the Delaware Supreme Court was wrong to say that it's automatic reversal, and what you need to do is assuming the full potential, full damaging potential to cross. So, you know, you're right, Your Honor. I cannot, I was not in the jury deliberation room. I can't tell you what the jury would have done with that cross. No one can tell you that. But Banarsdale says that's not really for the court to decide. You assume that the damaging potential was realized. Right, because we have to, that posits what the damaged potential is. I think framing it in Banarsdale, you would say, we can frame it as, okay, if we figure out they would have thrown this agent's testimony all the way out, then we can also engage in a trial-wide harmless error analysis and say, well, even if the jury thought that this witness was a nut, they totally would have convicted him because you had 17 other eyewitnesses and videotape and a confession, right? And I get it, but you still have to figure out how much impact this actually would have had on the jury's evaluation of the credibility of this witness. And that's where you're still in determining the predicate question of whether there's a constitutional violation. We have to figure out how much of a difference would it have made to that. And that's really distinct from a Rule 52 harmlessness inquiry. Your Honor, I think that that, with respect, is really not this court's job to figure out how much of an impact, as long as if you assume that the damaging potential was realized in full. And if you look at the Supreme Court in, I think, Davis, it basically says that. It says, you know, we don't know what would have happened, but the jury was entitled to decide that, not the judge. And here, you know, Your Honor, the Twomey testimony was absolutely hammered by the government. I mean, if you look at the prosecutor's summation, two full pages of the transcript are related to Agent Twomey. We know that, you know, Mr. Turley wanted to do this cross-examination. We wouldn't have tried to do it if we didn't think it would be effective. We know that the government opposed it. They wouldn't have opposed it unless they thought that there was some danger there. So we can't tell you, yeah, definitely the jury would have done this. But with respect, that's not something that this court has to wrestle with as long as it finds that the defendant was denied a full and fair opportunity to cross-examine for  Thank you. All right. What do we hear from the government? We have AOC Zuckerweis. Bring it down a bit.  Good morning, and may it please the court. Laura Zuckerweis for the government. Over the course of a four-week trial, the government proved beyond a reasonable doubt that defendants Eric Goldstein, Brian Twomey, Michael Turley, and Blaine Eiler participated in a 20-month-long bribery scheme in 2015 and 2016. After hearing testimony from nine government witnesses, hearing testimony from the defendants Goldstein and Twomey themselves, and reviewing hundreds of exhibits, including the defendant's own text messages and email communications, the jury convicted on all counts. The convictions should not be overturned for any of the reasons asserted by the appellants. The jury was properly charged here, and there are no arguments before the court to the contrary. The evidence was more than sufficient for a rational juror to find that the government proved the bribery scheme beyond a reasonable doubt. Now, as your honors know, despite the voluminous record here, there were very few actual issues of fact before this jury. It was beyond clear that the SOMA defendants provided things of value repeatedly to Goldstein through Range Mead Supply Company, or REMSCO, over a period of more than 15 months between the summer of 2015 and the late fall of 2016. Mr. Goldstein was, at least at the outset, he was the sole owner of REMSCO. At the outset, your honor, he was, through his own limited liability company, a 20% owner of REMSCO. By the end of the scheme, he took on 100% ownership of REMSCO. Oh, he took on 100%? Meisel didn't keep some? Eventually, he took over all of it, your honor. Through the agreement, SOMA transferred their ownership interest to Eric Goldstein. At that point, he owned 80%. Right. But then he ended up owning 100%. Okay, but that's sort of after the charge bribe events happened, right? I believe so, your honor. I don't know the exact date. I mean, a relevant period, he starts at 20% and ends at 80%. Whatever happened later is sort of gravy, right? More, that's fair, your honor. You don't care, right? Well, I don't think it's very relevant here. Sure. Thank you, Judge. All right. Now, the benefits that were provided to REMSCO included hotel stays and meals, the payment of legal fees incurred by REMSCO. Can you maybe jump to the quid pro quo aspect of it? We understand that there were exchanges happening, but that seems like that's the more critical issue. And I guess the one we focused on was what happened in November 2016. So perhaps you could address that. But the other thing I also was wondering is, aside from the lifting of the hold on the food and all of that, are there other specific quid pro quos that you're alleging here? Or is it, well, I'll leave the question that way. Sure. Yes, your honor. This was an ongoing conspiracy. And there were a number of quid pro quos that we were alleging and that we proved and that we argued to the jury. Now, in July of 2015, Mr. Eiler sends an email to his partners at SOMA saying that he had a good conversation with Mr. Goldstein. I'm just summarizing. And Mr. Goldstein said something to the effect of, in fact, Mr. Eiler put it in quotes, I'm going to buy a lot of chicken from you guys. Let's do the beef. Now, this is an explicit and express statement of a transactional agreement between the SOMA defendants and Goldstein. This is an overarching theme of the conspiracy, I guess you would be saying. But I think, was there a particular quid and a quo that were exchanged in connection with that email or that, you know, at that moment, you know, I'm going to buy the chicken, let's do the beef? At that moment, there wasn't an actual exchange at that moment. There was no official action at that moment. So I guess we get the overarching theory of what's going on and why they want to then engage in a series of quid pro quos, as you allege. But if I'm understanding, Judge Lee, give us some of these one for ones. Right. Sure. Because isn't that what's required? Not just a sort of general, you know, look out for me in the future or what have you. So that's, yes, that's what I'm looking for. Well, Your Honor, I do just, I will get to that. But I want to note, we really dispute that this was a general look out for me in the future kind of agreement when they entered into this agreement in July of 2015. What he said was, I, Eric Goldstein, the CEO of School Food, I'm going to buy a lot of chicken from you. That is a sufficiently specific and concrete question or matter right there to be compliant with McDonald. You're saying it relates to the overall, it itself may not be a quid pro quo, but it relates to your efforts to prove a quid pro quo. I mean, come on, that's what I'm really saying. Sure. Thank you, Judge. I'm happy to move on to the individual quid pro quos that exemplify this overarching arrangement. And I guess, I'm sorry, this may be about what you're getting to is, I'm just trying to be clear on whether or not in terms of something specific that you point to is, they agreed to do this in exchange for that. Is it the November 2016, is that the main or the best or the only arguably explicit, semi-explicit one? Or is there, are there some other exchanges of that kind? There are other exchanges of that kind, Your Honor. And the jury was charged. It can be this for that or these for those. And that reflects the law in the circuit and in the Supreme Court. So focusing on first the yogurt parfait, which was one of Soma's products. Now, Soma asked Eric Goldstein to expedite the menuing of the parfait. That meant more money for them if it could get on menu sooner than they would be making more money. That's in government. You could see, excuse me, you could see that at the joint appendix 3057-2305. He said, they say, they, the Soma defendants, they tell Eric, we may need a nudge. Don't want to wait until January to launch. In fact, Mr. Toomey, when he testified, agreed that expediting the parfait was a big deal to them. There's undisputed evidence in the record. The parfait was not ready to be expedited. And in fact, Goldstein's staff just disagreed strongly with expediting the parfait. That's at joint. And in exchange for that, he received. In exchange for that, he received a $20,000 payment. You can see that at joint appendix 1972. It was framed as a loan, but it was never repaid. And that was the loan from Soma to Rimscoe. That's correct. And the idea is that even though he was not, at that point, more than a 20% holder, he still was one of the beneficial owners of that. And then didn't some, remind me where the $20,000 flowed through to? Your Honor, generally speaking, the money that came into Rimscoe was all from Soma. No, no, no, where it flowed to, because I remember, and I'm going to forget, now there was one $3,000 that went to his father that went to him. Was that part of the 20 grand? Your Honor, there was a payment from the 20 grand to the law firm Schutz. So I believe it went from Soma to Rimscoe to Schutz and Bowen, at least a portion of it. And then I think it was later on, though I believe it's in our briefing, but I think it was later on that payments went from Soma to Rimscoe to the divorce lawyer, and from Soma to Rimscoe to Goldstein's father. The theory is of benefit to Goldstein on this is that Soma was ponying up all the money to support their joint venture. He wasn't putting in a dime. So he may not have gotten the full benefit of $20,000, but sort of the pro-rata value to the company that he had 20% of was still something. However we quantify it, $20,000 divided by five, the five beneficial owners. Say he got $4,000 worth of benefit. They're paying off part of the legal fees that he would have a 20% liability for.  But Your Honor, I would say it was even more than just the 20%, because the lawyers at Schutz and Bowen's were his college friends, and he testified that it was awkward for him that their money wasn't being paid back to them. So there was a value- That's the value? Well- I mean, I know you can have third party bribes, right? I will do something. I will exercise my official power if you give my buddy $20,000, but I didn't think there was any dispute that the friend here was doing legal work. There is no dispute as to that, Your Honor. I'm just noting that it was his friend. It mattered to Goldstein that those bills got paid, and those bills got paid. And Your Honor is absolutely right that there was an agreement among- But it has to be a thing of value to him, which I take it doesn't mean sort of emotional value. I think we're generally talking about economic value, right? Sure, and it is economic value. So if you talk about him being his buddy, I don't see how that's much of an economic value. Understood, Your Honor. It was a $20,000 payment into REMSCO, so there was an economic value. And so just to close the lid on the parfait- Can I just back up? This is the $20,000 that was wired from Soma's account to the REMSCO bank account? From Soma to REMSCO, yes, Your Honor. That's not the episode where $7,000 went to his divorce lawyer? Your Honor, I'm just not recalling which payment it was from which the money flowed to the divorce lawyer. If it did, let me just ask you this, and maybe the other side can correct me, because I may very well be confusing some of these transactions. But if some of that $20,000 that went to REMSCO, I guess you're saying, flowed through to Goldstein's divorce lawyer, that would be something that's very concretely of benefit to him, right? Yes, Your Honor, of course. And yes, my recollection is the payment to the law firm was approximately $12,000. So assume that's a quid or a quo. I don't know which side, depends on how you look at it. It's one of them. What's on the other side? What's the evidence that then contemporaneously he did something in exchange for that? What's the sum official act he took? Sure. The official act that he took was to expedite the service of the parfait. And what's the evidence that he was the guy doing the expediting, or directing people to do the expediting? It was underlings or something. At joint appendix 2321, this is an email from Stephen O'Brien, who worked under Goldstein. O'Brien writes, I was just informed that Eric is fast-tracking the parfait for December 17th. So that's, got it. So he took that action. He did that. Now, Your Honor, just moving on, there was also a matter of a fine on short, when Soma was not- I'm sorry, you said before, Senator, I couldn't miss it. You said you were going to put the lid on the parfait. Is that what you just did? Your Honor, I didn't even catch the pun in there. Is that what you just did? I think that we are finished with the parfait. Hopefully without scotch tape. Yes, hopefully not, Your Honor. I'm just proving I'm listening to that. So I do want to just touch on the fine, because I think that's an important one. Now, this was in January of the following year, 2016, and Soma had not- Give me the date again I didn't hear. January of 2016. Soma was now in the school system. They were providing parfaits, and they were providing chicken drumsticks, but they were not providing enough of these things. And so certain staff members of School Food decided that they were going to fine- effectively fine Soma, but the way this worked was they needed to fine the distributors, and the distributors would pass the fine along to Soma. So that's what they were going to do. This is Deb Asher, who testified as a witness, and Stephen O'Brien agreed. Now, this was a real problem for the Soma defendants. They did not want to be fined. They did not think that a fine was legal. So they sent- Mr. Turley sent an email to Mr. Goldstein asking him to intervene, and effectively asking him to review and cancel the fine. Immediately after sending that email, Mr. Turley writes to Eiler, and I could pull the- I have the- it's Joint Appendix 3067, which is Government Exhibit 2051. And he writes, send that PowerPoint to Eric ASAP, because I just put a turd in his inbox. The PowerPoint was a REMSCO PowerPoint that specifically detailed the way that Mr. Goldstein was going to profit from REMSCO's sale of hamburgers. So that is- it is clear that there was an exchange. It was clear that Mr. Turley is directing Eiler to make a promise of future payments to Eric Goldstein in exchange for Goldstein stepping in and canceling the fine. And he did step in, and he did cancel the fine. And where's the quo? So there's Eiler giving a quid. Is there evidence of a return quo? The quo, yes, your honor. Trial transcript 1998. This was when Mr. Goldstein was testifying on cross. The question, you stepped in and did that, right? Answer, yes. Okay. And then how do you respond? I know this is- I don't think this came up on the other side's argument, but I think the brief argued this was, if it happened, a move to lift a fine. But it doesn't fit into the overall conspiracy that's alleged by the government, which is chicken for beef. Because this would be, I guess, lifting a fine for beef, not buying products. So how do you respond to that? That, okay, maybe this is- assume it is a bribe. It doesn't fit into the conspiracy that was described. Respectfully, your honor, it does. Even though Mr. Goldstein said, I'm going to buy a lot of chicken from you. I think it's fair to understand that to mean school food is going to be putting money in your pocket for the products that we purchase from you. It's mostly chicken. Chicken was the one that really mattered. But it would have encompassed the parfait as well. And with respect to the fine, I think it's fair to say this isn't just about purchasing the food. It's also about making sure that any disputes are resolved in favor of SOMA so that they continue to make money. Your honor, then we get to the November-December quid pro quo, which was the chicken tender hold. And that was also- I see I'm over- I'm almost over time. Yeah, don't go away. All right. So your honor, this was also a quid pro quo. In this case, there were a number of issues with the food products. The chicken tenders were arriving broken. There were food safety issues, foreign matters in the food. And there were two holds that were put on the chicken tenders. Now, on November 15th, Mr. Turley, I believe, provides an email through, I think, Mr. Hamm, but don't quote me on that, to the DOE. And it's effectively a proposal. And the proposal is to eventually lift the hold and reintroduce the chicken tenders to school food. And in the meantime, to allow school food to substitute its chicken drumsticks for the chicken tenders. Now, at this time, there really were no other chicken providers at school food. So this mattered a lot to school food to get this resolved quickly. It mattered a lot to SOMA as well to get this resolved quickly because it's really their bottom line. SOMA had a drop-dead date of November 30th. They had to know by November 30th if this hold was going to be lifted, if they were going to be able to substitute their drumsticks because they had to ramp up production to make sure that they would have enough chicken to provide to school food. So they keep asking school food, what's going on? Like, what's the answer to our proposal? And school food staff are saying, we have to wait. We're not able to make a decision on that. And it was Eric Goldstein who was telling them to wait. And there was testimony on that from Stephen O'Brien. Why were you asked to wait a couple of days? Effectively, Eric told us to. Now, there are two dates that are particularly important here. The first is November 18th. That's just a couple of days after the proposal was first floated in November 15th. And what's- So you said a couple days after what? The SOMA proposal was first floated, which I believe was November 15th. And what happened was, first, the SOMA defendants are told by Goldstein that he would like to wrap up the REMSCO agreement and have it all resolved by Friday, which was November 18th, more or less. And at the same time, the school food staff is telling SOMA, we were asked to wait a couple of days. This was around November 15th, until it'll be decided. That means that both things are going to happen on November 18th. And SOMA knew that those two things were both happening at the same time, and that was by Goldstein's own machinations. Now, SOMA was not in a position to sign the REMSCO agreement by November 18th, so Goldstein did not lift the hold or agree to the proposal by that date. Now, let's fast forward a couple of weeks. Still just as urgent for SOMA, just as urgent for school food, but Goldstein continues not to make a decision. Meanwhile, there are a number of different emails exchanged about this REMSCO agreement and about getting to a point where they can agree on the terms. Comes to be November 29th. Finally, there's one day to decide. You can see that the numbers of communication about the REMSCO agreement have dramatically increased, and that the SOMA defendants are responding very quickly to Goldstein, whereas previously, earlier in the fall, there were weeks in between drafts being exchanged. Suddenly, it's happening. Goldstein writes an email, and they respond an hour later. On November 29th, they finally agree to sign on the dotted line. On November 30th, Mr. Toomey sends an email from an airplane saying, basically, has this been executed yet, talking about the REMSCO agreement, and simultaneously, Goldstein agrees with his staff that they can finally lift the hold. It is not an accident that these things are happening at the same time. What do you make of counsel's argument that the government is really focused on the wrong time, that you're looking at the time that the agreement was executed, but the relevant time, really, is when these terms were offered? Because really, the finalized agreement, more or less, memorialized terms that had been offered much earlier and before the second hold needed to be lifted. I dispute that characterization, Your Honor. I don't believe that you could say that there was an offer in the summer of 2016. What there was was a suggestion that everybody would begin to think about unwinding. But there was no meeting of the minds. There was no offer and acceptance at that time. And in fact, certain terms that Mr. Goldstein were floating were flat out rejected by the SOMA defendants. For example, Mr. Goldstein didn't even originally suggest that SOMA entirely extract itself. He suggested that they merely reduce their shares from 60% to 20% and remain partial owners of REMSCO. That is not, I mean, with respect to the statute of limitations argument, that is not a cessation of conspiratorial conduct. But it's also not a meeting of the minds with respect to what is on offer here. I'll note, Your Honor, that the appellants make much of a draft that's exchanged on September 28th of 2016. But in that draft, and I invite Your Honors to look at it, it's at Joint Appendix 2533, Government Exhibit 535. This is an email from Mr. Eiler to the other defendants summarizing the proposed terms of SOMA's exit from REMSCO. But the terms circulated contain no provision at all for payment to Goldstein. It's not in there. That agreement to pay $66,000 or any money is not in that agreement at all. So that also shows that this was an active negotiation. And that wasn't part of the offer in late September. It was part of the offer in November. Even if it had been discussed earlier, it was not in the September 28th draft. And I'll note, Your Honor, also that there were more discussions a little bit earlier on September 14th of 2016. This is at Joint Appendix 2520, where Mr. Turley is sharing a draft of an unwind agreement to his co-defendants at SOMA. And this draft contains a provision called sales collaboration, where Goldstein was going to provide introduction and endorsement to key food service operators for SOMA, and SOMA would pay Goldstein for that service. Now, we're not alleging that that's an official act. Introductions certainly aren't an official act. But it certainly shows that they had every intention at that time of continuing this kind of transactional conduct. So, Your Honor, the correct point in time is when this agreement is signed, or even when they agree to sign it, November 29th to November 30th. The payment is made, I believe, December 8th. Those are the points of time that the court should be concerned with. If it's okay, I was hoping to shift our attention to one of the other points that one of your adversaries raised, which is the question of the food contamination evidence. And the argument they're making is that, yeah, look, of course, you've got to tell the story to the jury. You've got to tell them why this food was put on hold, because otherwise the jury wouldn't be able to follow the narrative. And you can even say there's foreign matter in there, whatever. But once you get into, you know, why did you need photos of the chicken bone, for example? Why did you need that? Sure. I mean, weren't you just, frankly, just pushing the envelope way too hard and taking on way too much risk for the government? What does the photo of the chicken bone do to help prove that there's a bribe or not? Sure. Your Honor, I would note that we did less than we were allowed to do. Yeah, I know. But did you do more than you were supposed to do, right? I mean, that's not the question. I could have done worse, right? We certainly didn't do more than we were supposed to do under Judge Shin's rules. But those... But just tell me, why do you need a photo of a chicken bone? The photographs were attached to contemporary emails that were exchanged among the defendants. They were seen by the SOMA defendants. So it goes to their intent. It goes to their mental state. It was within the shadow of the food safety issues that this entire negotiation took place. And as Judge Shin held, we were entitled to show the jury how bad things were and to try to make them feel what it was that the SOMA defendants were feeling at that time. They said, and Mr. Toomey said this when he testified, their business was extremely precarious. It was more or less hanging by a thread. That was something he had said previously. The jury should have been allowed to feel how serious this was for the SOMA defendants, especially in light of the fact that in certain lines of cross-examination, the defense counsel was taking the position that it wasn't serious at all and that one in a million chicken tenders with a food safety issue was not a big deal. So in light of that, it was very important to be sure that the jury understood how serious these issues were. And that's exactly what the court found. Now, the court had occasion to conduct this balancing test multiple times, before trial, during trial, and after trial. Every time Judge Shin held that the food safety evidence was highly probative, he considered carefully the prejudicial nature of it. He held that it might be somewhat inflammatory, but it was not unfair, and that the probative value outweighed the prejudicial value. And given that, there was no abuse of his exercise of discretion here. I assume that you participated in the trial. I did, Your Honor. I presented the summation. Okay, I don't think we have any further questions, so thank you. Thank you, Your Honor. For the government. Why don't we turn back? I assume that we're going to follow the same batting order? Yes, Your Honor. So, Attorney Zaharia, you've got two minutes. I think we kept everybody up a long time on the initial arguments. We will try to keep the rebuttals fairly tight. So you have two minutes. Thank you. To start with the events of November and December of 2016, I want to clarify or correct two points the government made. First, on September 28th, when Mr. Eiler sent the terms that this was an offer, he said they were prepared to finalize them, and those terms absolutely included the payment. I point the court to JA 2536, where the draft agreement states that, in consideration for the legal travel and entertainment bills payment, Soma Food Group shall not be responsible for paying any other liabilities. What was that paid to the JA again? 2536. Okay. And second, I urge the court to look at the document that the government pointed you to, which is Mr. Goldstein's November 16th email, where he says it would be ideal to wrap this up tomorrow or Friday. It's at JA 2676. The idea that all of a sudden the communications became urgent is just contradicted by the record, because it took Mr. Toomey nine days to respond to Mr. Goldstein. And when he responded, he said, I'm waiting for our attorney to get back to me on the updated agreement. The idea that they saw a link between the two things is not supported by the record, and the idea that they suddenly frantically sprung into action and gave him the terms they were already ready to give him is not supported by the record. All of the other quid pro quos the government talked to you about, we dispute they are quid pro quos. I urge the court to read our brief on the timing of the yogurt parfait, because the government skipped over very important details. But they're all time-barred. All of those events occurred before the relevant statute of limitations date. And it's very telling that the government has to argue that this supposed agreement in July of 2015 related to chicken means anything that Mr. Goldstein would ever do. It means fines. It means yogurt parfait. It means anything. That is what this court held in silver is an improper as opportunities arise theory of bribery. For that reason, the conspiracy counts fail both on the merits, but they're also time-barred. Thank you, Your Honor. Thank you. Why don't we hear from Attorney Val Bernal. Thank you. I just want to reemphasize the pernicious effect of this conflict of interest evidence. As the government pointed out, there were many undisputed facts in this case. There were many emails going back and forth. And so the critical question was not what happened, but it was the intent of the parties when they were engaging in these various transactions. And the conflict of interest evidence went directly to that question and permitted the government to argue that Mr. Goldstein and his co-defendants had acted with a wrongful, corrupt, or nefarious intent, even to the extent that they did not actually act with a specific intent to engage in a bribery scheme or a quid pro quo. And that was not a problem that could be effectively remedied by the very long and general jury instructions that were given at the end, particularly in light of the government's use of this evidence throughout trial, where they repeatedly conflated the violation of conflict of interest rules with the criminal charges, arguing that if the defendants had the intent to violate those rules, then they had the intent to commit the crimes charged. The evidence was highly prejudicial and it warrants a new trial. Thank you. Okay, thank you very much. And last but not least, Attorney Hall. Your Honor, the government mentioned an email that Mr. Turley sent to Mr. Goldstein in January of 2016. And I encourage the court, if it has time, to read that email, because what it illustrates is that this was the antithesis of a bribery scheme. Mr. Turley is not asking for special treatment. The only thing he asked Mr. Goldstein for is to look at the contract and make the right, fair, legal decision. They're different than the other kind of bribery cases that this court has seen. With respect to the, you know, that kind of carries through to the other court. Do you just remind me, do you have the joint appendix page? I want to make sure I look at the right thing. No, that's fine. If it's not ready, we'll find it readily enough. But I just want to make sure that we look at the document you suggest we should. JA 2344. 2344. Thank you. Sorry. And the same, Your Honor, is true with respect to the yogurt parfait. It's true that someone wanted the parfait expedited, but they wanted the parfait expedited in early 2015. By the time Eric Goldstein got involved, they already didn't want it. It was already an inconvenience. And this is what school food employees testified. Mr. Goldstein expedited the yogurt parfait when it wasn't in someone's interest, when it was in the interest of school food, because they had this New York Thursday thing going on. And finally, Your Honor, I found the quote from the Supreme Court in Davis in terms of what the court's role is in determining the effectiveness of a proposed bias process. The Supreme Court said, we cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on the witness's testimony. So when the judge here exacerbated his error by refusing to allow us to recall Dwomey or strike Dwomey's testimony, he said, well, it's not particularly probative. It's not highly probative. With respect, that's not the standard that a district court should use in determining whether or not someone has a constitutional right to cross-examine for bias. Thank you. Thank you all. We will take the case under advisement. And before you leave, really want to thank all counsel. Those were very helpful arguments today, very well argued all around. Thank you. We will turn to the next case on the calendar, 25-159, Doe v. Seliger, et al. I'll tell you what. The court's going to stand in recess, give us five minutes, and we'll be right back out. If the courtroom deputy would just recess court for a second. Court stands in recess. Thank you. Thank you. Thank you. Thank you. Thank you.